**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **JOE LEE BROWN,** | ) |
| **AIS #00308577,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **vs.** | ) **Civ. Action No. 1:20-00550-KD-N** |
| | ) |
| **GUY NOE,** *Warden III,* | ) |
| *St. Clair Correctional Facility,* | ) |
| | ) |
| **Respondent.** | ) |

**ORDER**

This action is before the Court on the Report and Recommendation ("R&R") of the

Magistrate Judge, (Doc. 21), entered February 12, 2024, under 28 U.S.C. § 636(b)(1)(B-C), Rule

8(b) of the Rules Governing § 2254 Cases in the United States District Courts, and S.D. Ala.

GenLR 72(a)(2)(R), and Petitioner Joe Lee Brown's Objection thereto, (Doc. 23). After due and

proper consideration of the issues raised, and a *de novo* determination of the portions of the R&R

to which objection was made, the R&R, (Doc. 21), is **ADOPTED IN PART** as the opinion of this

Court.  Specifically, the Court adopts the R&R, (Doc 21), including the conclusions.  However, as

to Claim 3, the Court agrees that no relief is due and the Brown has not shown prejudice, but for

reasons slightly different than those discussed in the R&R.

At the outset, the Court notes that 28 U.S.C. § 2254(d) deference is implicated as to

Petitioner's Claim 3.[1] § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act

---

[1] When a constitutional claim upon which the petitioner seeks relief under § 2254 is not procedurally defaulted but instead has been adjudicated on the merits in state courts, § 2254(d) still restricts the Court's ability to grant relief on those claims. Woods v. Stewart, No. 2:16-CV-01758, 2018 WL 3455686, at *15 (N.D. Ala. July 18, 2018). § 2254(d) applies to a state court's prior rejection of the petitioner's identical claim in a state collateral proceeding even when the state court's order is unaccompanied by an opinion explaining the reasons for denial of relief. Harrington v. Richter, 562 U.S. at 98 ("As every Court of Appeals to consider the issue has recognized, determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an

1

of 1996 (AEDPA), creates a "highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010). Because this review entails the combination of the "deferential lens of § 2254(d)" with the already "highly deferential" scrutiny of trial counsel's performance, see Strickland v. Washington, 466 U.S. 668, 689 (1984), the Court's review of Petitioner's allegations in Claim 3 must be "doubly deferential." Cullen v. Pinholster, 563 U.S. 170, 190 (2011). Since the Strickland standard is general, "the range of reasonable applications is substantial." Richter, 562 U.S. at 105. As such, a state court has even more latitude to reasonably determine that the petitioner has not satisfied it. Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

Per the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const., amend. VI. To succeed on an ineffective-assistance-of-counsel claim under Strickland and prove that his Sixth Amendment right to counsel was violated, the § 2254 petitioner must show that (i) counsel's performance was deficient; and (ii) that the deficient performance prejudiced his defense. 466 U.S. at 687.

---

opinion from the state court explaining the state court's reasoning."). In other words, such a summary denial is nonetheless an adjudication "on the merits" for purposes of Section 2254(d). Here, the ACCA's denial of what now constitutes Petitioner's Claim 3 was not a merits determination because the court expressly rested its rejection of the claim on Ala. R. Crim. P. 32.2(a)(4)'s preclusion rule and only that rule. (See Doc. 11-27 at 6); Williams v. Ala, 791 F.3d 1267, 1273 (11th Cir. 2015) ("A decision that is based on state procedural grounds is not an adjudication on the merits."). However, the Choctaw County Circuit Court previously denied Petitioner's Rule 32 Petition in a one-sentence order: "Rule 32 PETITION filed by BROWN JOE LEE #308577 is hereby DENIED." (Doc. 11-24 at 89). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. As stated above, this applies with equal force – such that § 2254(d) deference is implicated – when the state court decision denying the petitioner's identical claim is unaccompanied by an explanation. Id. at 98-100.

Deficiency "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. That is the petitioner must show that counsel's representation fell below an objective standard of reasonableness. Id. at 687-88. "There is a strong presumption that counsel's conduct fell within the range of reasonable professional assistance, and, therefore, counsel's performance is deficient only if it falls below the wide range of competence demanded of lawyers in criminal cases." Osley v. U.S., 751 F.3d 1214, 1222 (11th Cir. 2014). Establishing prejudice necessitates "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Because both parts of the Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Ward, 592 F.3d at 1163; Osley, 751 F.3d at 1222 ("[A] court need not address both prongs if the defendant has made an insufficient showing on one.").

At trial, Janice Young testified that on the night of Mr. James' murder, she saw Mr. Brown in bushes near the crime scene, and that he then fled. (Doc. 11-10 at 91). According to Sharon "Peaches" Johnson, she saw Mr. Brown the night of August 22, 2014 – the date of James' murder – at George Ward's house and that "[h]e was pretty beat up" and bloody. (Id. at 111-12). Johnson then testified that Brown told her that a man named Dashawn "beat him up at the park." (Id. at 112). Marcus Thomas testified that on a night around the time of Mr. James' murder, he and Brown got high together, that Mr. Brown had a black eye and "seemed kind of paranoid," and that he later dropped off Brown at Ward's residence. (Doc. 11-8 at 175-78). Thomas also claimed that he noticed a stain on Brown's shirt that night that "[c]ould have been blood." (Id. at

182). Johnfanan Ruffin took the stand and said that he saw Mr. Brown walking on Dicey Road, which is near Johnny Williams Road, where James' body was recovered, the night of August 22. (Doc. 11-10 at 134). Terrell Harris testified that he saw Brown around the time of James' murder and that he had a black eye and some scratches. (Id. at 147-48).

Evelyn Polk, Mr. Brown's manager at McDonald's, testified that after working earlier in the day August 22, Brown, despite being scheduled to do so, did not show up to work again until August 28. (Doc. 11-8 at 118). Indeed, despite "always call[ing] and let[ting] [McDonald's] know why he wasn't coming in," Brown neither showed up to work nor called to explain his absence during that period. (Id. at 119-20). At a meeting with Mr. Brown when he returned to work, he had a "small cut on his hand" as well as "a small cut, maybe, like a swollen eye." (Id. at 120-21). After working another three days, Mr. Brown's employment at McDonald's ended after "[h]e stopped coming in to work." (Id. at 122).

Additionally, Travis Downey, operator of a tracking dog service, testified that around noon on August 23, his harnessed bloodhound smelled a "pile of blood" at the crime scene and "hit on a scent on a trial," tracking the scent down Johnny Williams Road to a trailer house, then behind it to a spigot, and then through a power line clearing before jumping a ditch at the bottom of a hill and stopping for the day. (Doc. 11-7 at 133-40). The next day, beginning at the crime scene, the dog retraced its tracks and followed the same route before crossing on and off a blacktop road and then proceeding down a dirt road, approaching and then leaving a brick house, and finally burying his nose in shoes on the front porch of a mobile home and "jump[ing] up on the front door of the trailer house like he was trying to get in." (Id. at 140-42). The brick house belonged to Brown's mother-in-law, while Brown lived in the mobile home. (Doc. 11-8 at 63-64).

4

Janice Young also testified that during one of the occasions that she saw Mr. Brown on August 22, 2014, Brown tried to sell her a pair of shoes. (Doc. 11-10 at 96). Jackie Deloach also saw Mr. Brown the night of August 22 about "25, 50 yards" from Johnny Williams Road carrying a bag containing what looked like shoe boxes. (Doc. 11-8 at 105). The night that Marcus Thomas dropped off Brown at George Ward's house, Mr. Brown was carrying a shoe box, something he had never seen Brown carrying before. (Id. at 178). Photographs extracted from the victim's cell phone that were taken on August 22 show a pair of black shoes in a shoe box and a receipt from a Sears in Meridian, Mississippi that indicated the purchase of black leather shoes earlier that day. (Doc. 11-9 at 85). A frequent buyer account number at the bottom of the receipt was linked to Glenda Brown, Mr. Brown's wife. (Id. at 108). Cell phone data demonstrated that two calls were placed from James' phone to Brown's at 8:41 and 8:42 p.m. the night of James' death. (Id. at 81-82). No further calls or text messages were sent from James' phone after 9:07 p.m. that night. (Id. at 99).

The prosecution's DNA expert, Patricia Boyd of the Alabama Department of Forensic Sciences, testified in the State's case-in-chief regarding the results of genetic evidence that tied Petitioner to James' murder. (See Doc. 11-9 at 116-153). Boyd explained that a cheek swab from Mr. Brown (State's Ex. No. 41/Item No. 13) was taken to obtain a DNA reference standard for comparisons to the DNA results of other evidence items. (Id. at 125-26). Regarding genetic traits detected in the strain from twig/vine evidence collected at the crime scene (State's Exhibit No. 43/Item No. 11H), Ms. Boyd testified that both Mr. James and Mr. Brown were included as potential contributors to the mixture. (Id. at 147-48; see also Doc. 11-5 at 1-2). Ms. Boyd asserted that the "probability of including a random, unrelated individual as a potential contributor to this mixture is approximately 1 of 102 trillion Caucasian individuals and 1 of 345

trillion African-American individuals."[2] (Doc. 11-9 at 148). Further, Ms. Boyd testified that the strain from leaf evidence (State's Exhibit No. 43/Item No. 11B) from the crime scene matched Petitioner's DNA profile, and "the combination of genetic traits occurs in approximately 1 in 9.3 decillion random, unrelated Caucasian individuals [and] 1 of 11.3 nonillion random, unrelated African-American individuals. With a high degree of confidence, Mr. Brown, or his identical twin, is the source of the genetic traits detected in item 11B." (Id. at 152). Ms. Boyd also stated with a high degree of confidence that Mr. James, or his identical twin, was the sole source of the genetic traits from additional twig/vine evidence (State's Exhibit No. 43/Item 11A). (Id. at 139-40).

Separately, Boyd testified regarding the DNA results of nail clippings recovered from James' right hand (State's Exhibit No. 11/Item No. 1G):

> So in the previous report, the DNA profile that was obtained from the right nail cuttings, item 1G, was a mixture of at least two individuals, at least one of which was male. So the major DNA profile detected from that item and the DNA profile of Mr. James match. Upon comparing Mr. Brown's known sample to that evidence item, it is interpreted that Mr. Brown is included as a potential minor contributor to the mixture of genetic traits detected in the right nail cuttings, item 1G. The probability of including a random, unrelated individual as a potential contributor to this mixture is approximately 1 of 421 Caucasian individuals, and 1 of 622 African-American individuals.

(Id. at 141). On cross-examination, defense counsel and Ms. Boyd engaged in the following exchange:

> DEFENSE COUNSEL: What about the alleles that Mr. Brown possesses that were not in the nail cuttings?

---

[2] Previously, Ms. Boyd explained to the jury how and why population frequency statistics are used in forensic DNA analysis. (Doc. 11-9 at 132-33). Dr. Ronald Acton's report stated, "In my opinion the frequencies in which the genetic traits observed on the Stain from Red Shirt (Item 2A) are estimated to appear in unrelated Caucasian and unrelated African American individuals are inflated. The frequencies reported in the quintillions for random, unrelated Caucasian individuals and random, unrelated African-American individuals are greater than the number of persons who have ever lived on earth." (Doc. 11-5 at 22). Dr. Acton did not address Ms. Boyd's assignment of probabilities as to any of the evidence items other than Item 2A nor explain to what degree he believed Ms. Boyd's assigned probability as to the Red Shirt to be "inflated." (See id.).

BOYD: Mr. Brown was included as a potential minor contributor. And it is true that some of Mr. Brown's DNA types were not present, but that is expected based on the amount of the potential minor contributor contributing to the sample in much smaller amounts, and it's not unexpected that we do not detect full information regarding a minor contributor to the sample.

DEFENSE COUNSEL: What does that mean?

BOYD: So, again, the mixture obtained from the right nail cuttings, item 1G, was a resolvable mixture with the major component detected in high amounts than the minor component. And, so, there was full information with regards to the major contributor to that sample, but because of the smaller amount of DNA detected regarding the minor contributor, there was not full information regarding that minor contributor.

(Id. at 171-72).

Meanwhile, attempted defense DNA expert Dr. Acton's report included the following relevant conclusions:

I agree with the DNA profiles generated for Joe Lee Brown (Item 13) and Jeremy Wayne James Item (1J).

The DNA profiles generated for the Rt. Nail Cuttings (Item 1G) are a mixture of DNA profile from two or more individuals. Joe Lee Brown possesses alleles at several loci that are not present in the DNA profiles from the Rt. Nail Cuttings (Item 1G). Thus Joe Lee Brown can be excluded as having contributed his genes to the DNA profile from the Rt. Nail Cuttings (Item 1G).

. . .

I agree that the DNA profile detected on Twig/Vine (Item 11A) is consistent with the DNA profile of Jeremy Wayne James (Item 1J). Thus Jeremy Wayne James cannot be excluded as having contributed his DNA to this evidence item.

. . .

My review of the DNA evidence materials provided may not have detected any mistakes made by the ADFS Mobile Laboratory that could have led to a false positive match. The only way to verify the results generated by the ADFS Mobile Laboratory is to obtain an independent test of a portion of the original evidence.

(Doc. 11-5 at 22).

Even assuming trial counsel performed deficiently by failing to timely disclose Dr. Acton as a defense expert, particularly considering the "doubly deferential" standard involved here, Cullen, 563 U.S. at 190, Petitioner has failed to carry his burden to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 694. Ms. Boyd explained on cross-examination why the fact that some of Mr. Brown's DNA types were not present in the Rt. Nail Cuttings (State's Exhibit No. 11/Item No. 1G) was expected, thereby addressing Dr. Acton's remark that "Joe Lee Brown possesses alleles at several loci that are not present in the DNA profile from the Rt. Nail Cuttings (Item 1G)." (Doc. 11-9 at 171-72; Doc. 11-5 at 22). However, ultimately Ms. Boyd and Dr. Acton came to irreconcilable conclusions regarding whether Brown could be excluded from having contributed his genetic material to the Rt. Nail Cuttings. (Compare Doc. 11-9 at 141 ("[I]t is interpreted that Mr. Brown is included as a potential minor contributor to the mixture of genetic traits in the right nail cuttings, item 1G. The probability of including a random, unrelated individual as a potential minor contributor to this mixture is approximately 1 of 421 Caucasian individuals, and 1 of 622 African-American individuals.") with Doc. 11-5 at 22 ("Thus Joe Lee Brown can be excluded as having contributed his genes to the DNA profile from the Rt. Nail Cuttings (Item 1G)."). Nevertheless, Dr. Acton's report included no indication that, if he were permitted to testify, he would have attempted to rebut Ms. Boyd's conclusions regarding Brown's inclusion as a potential contributor to the DNA profile in twig/vine (Item No. 11H) and leaf (Item No. 11B) evidence collected at the crime scene. Rather, Dr. Acton's report merely agreed with Ms. Boyd that the DNA profile from additional twig/vine evidence (Item No. 11A) matched that of Mr. James. (Doc. 11-5 at 22).

Not to mention that an abundance of other evidence was presented to the jury that connected Brown to Mr. James' murder, including testimony regarding Brown's vicinity to the crime scene that night, his appearance and behavior that night, his subsequent disappearance from work, a bloodhound that tracked from the crime scene to Brown's trailer, and phone calls that were sent from James' phone to Brown's the night of James' death. Simply put, even disregarding the § 2254(d) deference the Court is obligated to apply here, it is far from reasonably probable that but for trial counsel's delayed disclosure of Dr. Acton's report – which caused Dr. Acton's subsequent inability to testify – the result of Mr. Brown's trial would have been different. See Strickland, 466 U.S. at 694

Accordingly, it is **ORDERED** that Petitioner **JOE LEE BROWN**'s operative petition for a writ of habeas corpus under 28 U.S.C. § 2254 in this action, (Doc. 5), is **DENIED** and **DISMISSED with prejudice**, and that Brown is not entitled to a Certificate of Appealability in relation to this final adverse order.

Final judgment shall issue separately in accordance with this order and Fed. R. Civ. P. 58.

**DONE** this the 6th day of March 2024.

**/s / Kristi K. DuBose**
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**